TRAVIS DELANEY WILLIAMS,

    Plaintiff,

v.                                                                                                    Case No. 19-C-1159

ZACHARY ELLEFSON, et al.,

    Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

      Plaintiff Travis Delaney Williams, a prisoner who is representing himself, filed this action under 42 U.S.C. §1983, alleging that Defendants violated his constitutional rights. The case is before the Court on Defendants' motion for summary judgment, which is fully briefed and ready for the Court's decision. Williams, who had mistakenly been given another inmate's medication, was afraid that he would become ill. He demanded to see a nurse and, because he believed he was being ignored, he began to act out to force officers to give him what he wanted. The situation devolved when other of Williams' demands were not met. He was denied medicated soap to wash off pepper spray, a chair to steady himself during a strip search, and specimen cups to collect his feces. In response, Williams threatened staff, yelled a near constant stream of expletives, disobeyed simple rules and direct orders, spread feces in a holding cell, and threw feces through the trapdoor into the hallway. Video evidence shows that, throughout it all, officers remained calm, patient, and professional. The Court will grant Defendants' motion and dismiss this case.

## BACKGROUND

Williams is incarcerated at the Wisconsin Secure Program Facility (WSPF). Dkt. No. 91 at ¶1. At the relevant time, Defendants all worked at WSPF. Bradley Fedie was a lieutenant; Defendants Mindy Bockorny, Zachary Ellefson, Timothy Jones, Michael Roth, and Floyd Webster were corrections officers; Defendant Ben Tierney was a sergeant; Defendant Jolinda Waterman was the health services manager; Defendant Tammy West was a nurse; and Defendant Julia Payne was an institution complaint examiner. *Id.* at ¶¶2-12.

On February 24, 2019, sometime between 7:15 p.m. and 7:45 p.m., Ellefson mistakenly gave Williams medications that were intended for another inmate with the same last name. Dkt. No. 91 at ¶13; Dkt. No. 104 at 3. Williams says he knew he would have an adverse reaction and began to experience chest and stomach pains. He told Ellefson he needed something to induce vomiting, and he demanded several times to see a nurse. Dkt. No. 104 at 4-6.

After a couple of hours, at about 9:20 p.m., a staff member radioed Fedie and asked him to report to Williams' unit because he had covered his cell window and was not responding to staff. Dkt. No. 91 at ¶¶14-15. Fedie learned that Williams had been refusing to respond to orders to uncover his window. *Id.* at ¶16. Fedie ordered Williams to uncover his window; Williams refused. *Id.* at ¶17. Fedie gave a second order; Williams again refused. *Id.* Fedie asserts that he told Williams that he would use pepper spray if Williams did not uncover his window, but Williams did not respond. *Id.* at ¶18. Williams says Fedie was "hollering and screaming" and he "did not know what he said." Dkt. No. 102 at ¶18.

Fedie explains that, after Williams failed to uncover his window and did not respond to the warning that pepper spray would be used, he directed Saylor to open the middle trapdoor on the cell door and Fedie then sprayed a one-second burst of pepper spray into the cell. Dkt. No. 91 at ¶21. Williams asserts that Fedie sprayed him after he stood up to see what was going on. Dkt.

2

No. 102 at ¶21. Williams explains that he has a medical restriction against pepper spray being used on him. *Id.* at ¶22. According to Fedie, because of the emergent nature of the situation, he was unable to check the computer for medical restrictions and was unaware that Williams had such a restriction. Dkt. No. 91 at ¶22. Fedie asserts that he used the minimal amount of pepper spray necessary to gain Williams' compliance. *Id.* After the short burst of pepper spray, Williams uncovered his window. *Id.* at ¶25. An officer with a handheld video camera arrived to record Williams being transported to a holding cell where he would be strip searched. Eventually, as directed, Williams placed his hands out of the trapdoor so restraints could be applied. *Id.* at ¶26.

Titlbach was unable to apply a single set of handcuffs because of Williams' size and his inability to get his hands close together behind his back, so he used two sets of handcuffs. Dkt. No. 91 at ¶29. Williams had a restriction for soft cuffs, but Fedie says he was unaware of that restriction and, in any event, soft cuffs were not available at the time. *Id.* After the handcuffs were applied, Williams backed out of his cell as directed, and Saylor grabbed Williams' left arm at his bicep and Titlbach grabbed his right arm at the bicep. *Id.* at ¶30. Williams told Fedie it was "bullshit that [he] would spray [him] cause [he] asked for medical help," and asked to see health services. Dkt. No. 102 at ¶31; Dkt. No. 91 at ¶31. Fedie told Williams he would call health services after they transported Williams to the new unit. Dkt. No. 91 at ¶31.

Leg restraints could not be applied because of Williams' size, but Williams complied with walking without incident and was transported to a holding cell to be strip searched. Dkt. No. 91 at ¶33, 36. Once at the holding cell, Williams entered, the restraints were removed, and the trapdoor was secured. *Id.* at ¶34. Williams was calm until the restraints were removed, but then he started yelling at Fedie, calling him vulgar names, threatening him, and pulling out his penis while saying, "suck this." *Id.* at ¶35. Fedie advised Williams that, because of his actions and

3

threats to staff, he was being placed in control status, during which he would be observed every thirty minutes. *Id.* at ¶¶36-37.

At first, Williams cooperated with the strip search and complied with Saylor's orders to hand his clothing out of the trapdoor, but then he stopped complying, started yelling expletives at Fedie and started to spit at the window. Dkt. No. 91 at ¶39. Saylor told Williams to keep handing out his clothes, and Williams threw his glasses out of the trapdoor while yelling more expletives and threats. *Id.* at ¶40. Williams then held his penis out of the trapdoor and said, "You can suck this motherfucker . . . ." *Id.* at ¶41. Officers closed the trapdoor when Williams stepped back. *Id.*

Fedie directed staff to turn on the water to the shower so Williams could rinse off the pepper spray, but Williams declined after Fedie told him he could not have his medicated soap until he was transported to his new cell (which would occur as soon as the strip search was completed). Dkt. No. 91 at ¶42. Roth attempted to complete the strip search by giving Williams commands through the cell door. *Id.* at ¶45. He directed Williams to one of the walls and told him to bend over and separate his butt cheeks so he could check his anus. *Id.* Williams says he cannot stand freely and bend over without falling, so he told Roth that was not going to happen. Dkt. No. 102 at ¶45. Roth explained that he needed to check his anus for contraband and directed him again to bend over and separate. Williams made what Roth describes as a controlled fall to the floor. Dkt. No. 91 at ¶45. Williams says Roth laughed when he fell, but Roth denies laughing at any time during the incident. Dkt. No. 102 at ¶46; Dkt. No. 91 at ¶46.

Williams stayed on the ground for a couple minutes and did not respond to Fedie telling him he needed to get up or a team would have to enter the cell. Eventually, as officers waited and encouraged him to stand so they could complete the search, he crawled on his hands and knees to the door and used the trapdoor to stand up. Dkt. No. 91 at ¶47. After completing the search, Roth

4

opened the trapdoor and gave Williams socks, underwear, and a t-shirt. *Id.* at ¶48. Williams did not put the clothes on. Williams explains he had pepper spray on him, and he did not want to rinse it off without soap because using plain water would cause it to burn.

At about 9:30 p.m., Waterman, who was working as the off-site, on-call nurse received a call from security staff who told her Williams was complaining of a burning stomach after receiving another inmate's medication. Dkt. No. 91 at ¶91. Waterman asked security staff about Williams' appearance and decided that his actions were not consistent with someone who was experiencing emergent chest or stomach pains. *Id.* at ¶102. Waterman reported to the institution to check on Williams, but because of inclement weather, she did not arrive until after 10:00 p.m. *Id.* at ¶¶93-95.

Fedie left the holding cell to call a supervisor to inform him of what was happening. Dkt. No. 91 at ¶49. Fedie asked if he could leave Williams in the holding cell and have staff perform their thirty-minute checks there rather than transport Williams to his new cell. *Id.* Fedie returned to the holding cell, after which Williams punched his cell door and continued to yell at staff (Williams denies punching anything). Dkt. No. 91 at ¶50; Dkt. No. 102 at ¶50. Fedie encouraged Williams to get dressed so he could be moved to his new cell; Williams refused. At about 10:00 p.m., Fedie assembled staff away from the holding cell and, just before the video ends, did a debriefing on camera. Dkt. No. 91 at ¶ 50. Fedie noted that nursing staff had been called and would report to the institution. *Id.* When staff moved away from Williams' cell front, Williams was standing calmly and quietly at his cell door.

According to Ellefson, about fifteen minutes later, at about 10:15 p.m., he heard Williams state, "I done shit myself." Dkt. No. 91 at ¶81. Williams had slammed on the lower trapdoor enough to open it, so Ellefson tried unsuccessfully to close it. *Id.* Ellefson noticed that there was

5

feces spread around inside the cell. *Id.* Ellefson asserts that it was not safe to get close to the cell because of Williams' disruptive and combative behavior, including Williams throwing feces through the trapdoor into the hallway. *Id.* at ¶84.

Leffler checked on Williams about ten minutes later, at 10:25 p.m.; Williams was yelling threats and demanding to see a nurse. Dkt. No. 91 at ¶61. He, along with other staff, spoke to Williams for about twenty minutes. *Id.* at ¶86. Jones checked on Williams at 10:30 p.m. and 11:00 p.m. and saw that he was talking to staff. *Id.* Bockorny performed three wellness checks on Williams at 11:15 p.m., 12:00 a.m., and 12:15 a.m. Dkt. No. 91 at ¶54. Because Williams had continued throwing feces into the hallway, another officer escorted Bockorny past Williams' cell with a shield. *Id.* at ¶56.

After midnight, Williams began to comply and was taken by wheelchair to see Waterman. *Id.* at ¶¶66, 87, 104; Dkt. No. 102 at ¶104. Waterman took his vitals and performed an assessment. Dkt. No. 91 at ¶104. Throughout the ordeal, Williams refused Maalox, TUMS, pain medication, and pink bismuth, which is an over-the-counter medication used to treat occasional upset stomach, heartburn, and nausea. *Id.* at ¶¶103, 106-107. Williams was placed in another cell without further incident. *Id.* at ¶87.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* All reasonable inferences are construed in favor of

the nonmoving party.  *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).  The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial."  *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted).  "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts."  *Id*.  Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial."  *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotations omitted).

## ANALYSIS

### A. Williams' Claim that Fedie Violated the Eighth Amendment When He Pepper Sprayed Him Must Be Dismissed.

Williams asserts that Fedie used excessive force when he sprayed pepper spray into his cell after Williams refused to comply with commands to uncover his window.  According to Williams, he had a medical restriction against the use of pepper spray, and he was in the process of complying when Fedie sprayed him.  Fedie explains that Williams had refused to acknowledge or respond to multiple staff members' commands to uncover his window, so he used a minimal level of force to gain Williams' compliance.  Fedie asserts that he did not know about the medical restriction against using pepper spray, and given the emergent nature of the situation, he did not have an opportunity to check on possible restrictions.

The key inquiry in evaluating a prison official's use of force is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm."  *Hudson v. McMillian*, 503 U.S. 1, 7 (1992).  "To determine whether force was applied in good faith, [courts] consider several factors, 'including the need for the application of force, the amount of force applied, the threat an officer reasonably perceived, the effort made to temper the

7

severity of the force used, and the extent of the injury that force caused to an inmate.'" *Santiago v. Walls*, 599 F.3d 749, 757 (7th Cir. 2010) (quoting *Fillmore v. Page*, 358 F.3d 496, 504 (7th Cir. 2004)). To survive summary judgment, a "prisoner must have evidence that will support a reliable inference of wantonness in the infliction of pain." *Id.* (citations and quotation marks omitted).

Each of the above factors weighs in favor of finding that Fedie used the short burst of pepper spray in an effort to maintain or restore discipline. First, there is no dispute that Williams was breaking rules and ignoring orders. Williams admits that he covered his window and ignored officers' orders to uncover it. Fedie explains that for the safety of the institution and the prisoners, officers must be able to see into prisoners' cells at all time, particularly when, as was the case here, a prisoner complains of feeling unwell and demands to see a nurse. Williams tries to excuse his misconduct by explaining that it was the only way to get what he wanted, but *why* Williams was breaking the rules is irrelevant. Prisoners are not at liberty to decide which rules and orders they will comply with; they "are and must be required to obey orders." *Lewis v. Downey*, 581 F.3d 467, 476 (7th Cir. 2009) (citations omitted). Allowing prisoners to assert their authority over the institution places staff and other inmates in danger. *Id.* The fact is that Fedie had limited options to restore discipline in the face of Williams' dogged refusal to comply with simple, straightforward rules and orders.

Next, the amount of force Fedie used was minimal as was the extent of injury to Williams. Fedie says he sprayed only one second of spray into Williams' cell; Williams says it was more like five seconds. In either case, it was not an excessive amount. Although there is no video of Fedie using the spray, video coverage begins shortly after the spray was used when Williams is being removed from his cell. An officer acts quickly to apply the handcuffs to get Williams out of the cell. Once out, Williams coughs lightly a couple times, clears his throat, and spits onto the floor

8

twice, but he seems mostly unaffected. His eyes do not appear irritated and he is breathing and talking normally and without effort. Based on Williams' appearance shortly after the spray was used, no jury could reasonably conclude that Fedie used an excessive amount or that Williams was more than mildly impacted.

While there was a medical restriction stating that officers should not use pepper spray against him, Fedie explains that he did not know about the restriction and given the pressing need to gain Williams' compliance, there was inadequate time check the computer on the off-chance such a restriction existed. It has long been held that, to incur culpability, an "official must actually know of and disregard the risk." *Lewis v. Richards*, 107 F.3d 549, 553 (7th Cir. 1997). Williams has presented no evidence to rebut Fedie's assertion that he did not know pepper spray posed a special risk to Williams.

Finally, as noted, Williams' refusal to comply with repeated orders to uncover his window supports a conclusion that some use of force was necessary to gain compliance. Williams concedes that officers' efforts without the use of force had been ineffective. Williams says he was standing up to comply or at least to see what was happening when Fedie sprayed him through the trapdoor. He acknowledges that Fedie was "hollering" about something but he could not make out what he was saying. Of course, Fedie had no way of knowing what Williams was doing because Fedie could not see into Williams cell. Fedie also could not know that Williams had not heard his warning that pepper spray would be used because Williams was not responding to anything Fedie said. All that Fedie knew was that Williams was persisting in refusing to uncover his window even after he warned him that pepper spray would be used.

9

Based on this record, no jury could reasonably conclude that Fedie's use of pepper spray to gain Williams' compliance with orders to uncover his window was malicious or sadistic or for any purpose other than to restore discipline. Fedie is entitled to summary judgment on this claim.

**B. Williams' Claims that Defendants Violated the Eighth Amendment When They Handcuffed Him and Walked Him Down the Hall Must Be Dismissed.**

Williams asserts that Defendants were deliberately indifferent to his serious health conditions when they handcuffed him and forced him to walk from his cell to the holding cell. Williams explains that because of his size and injuries to both shoulders he cannot be handcuffed behind his back. Further, given problems with his feet and legs, he has difficulty walking and should have been allowed to use a walker or wheelchair. To survive summary judgment, Williams must present evidence showing that "(1) his medical need was objectively serious, and (2) the defendants consciously disregarded this need." *Berry v. Lutsey*, 780 F. App'x 365, 368-69 (7th Cir. 2019) (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). Based on the video of Defendants restraining Williams and escorting him to the holding cell, no jury could reasonably conclude that Williams makes such a showing.

The video begins with officers quickly moving to restrain Williams in order to minimize the amount of time he has to have his hands behind his back and in order to get him out of the cell into which pepper spray had been sprayed. When it becomes clear that a single set of handcuffs will not work, they use two sets linked together. The result is that Williams' arms hang nearly straight down with almost no pressure on his shoulders. Officers then restrain Williams by holding his arms and standing slightly behind him. They allow Williams to set the pace as they walk slowly to the holding cell. Williams' gait is slow but steady. Views of his face show he is relaxed and there is no indication of any pain or discomfort.

10

Case 1:19-cv-01159-WCG   Filed 03/16/21   Page 10 of 17   Document 113

"When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on summary judgment." *Scott v. Harris*, 550 U.S. 372, 378 (2007). Williams' assertions that officers treated him roughly and ignored his various conditions while restraining him and escorting him to the holding cell are blatantly contradicted by the video. Officers treated Williams gently and with patience. As such, Defendants are entitled to summary judgment on this claim.

### C. Williams' Claims that Defendants Violated the Eighth Amendment When They Strip Searched Him Must Be Dismissed.

Prison officials violate the Eighth Amendment, when they conduct a search "in a harassing manner intended to humiliate and inflict psychological pain." *Mays v. Springborn*, 575 F.3d 643, 649 (7th Cir. 2009) (citations omitted). After watching the video, no jury could reasonably reach such a conclusion about the way officers handled Williams' strip search.

Defendants explain that all prisoners who are moved from one housing unit to another are strip searched to prevent the movement of contraband between housing units. The video shows that, after Defendants placed Williams into the holding cell, they calmly order him to hand out his clothing. Over the course of a few minutes, Williams hands out his clothing and throws out his glasses and hearing aid. Defendants never rush him; they patiently keep him on task and repeat orders when he slows down or stops complying. Finally, after his clothing is removed, an officer tells him he needs to conduct the search. Williams tells the officer he cannot stand on his own and needs his walker. The officer tells him he can go lean up against the wall, and they will do the search slowly. He instructs him to pick up his hands and feet and open his mouth. More than once he advises Williams to use the wall to steady himself. Everything proceeds relatively smoothly up until Williams is ordered to bend over and spread his butt cheeks. Williams states he cannot

11

physically do that; the officer explains why he needs him to do that. The officer is calm. It is unclear where in the cell Williams is standing, but the officer does not say or do anything to prevent Williams from using the wall to steady himself.

Although the video does not show Williams, the officer notes to the camera that Williams fell. He seems unconcerned and later whispers to other officers that it was a "controlled fall." Fedie tells Williams he needs to get up so the strip search can be completed and they can move him to his new cell. Williams remains on the floor and softly groans for about two minutes. The officers patiently wait, and Fedie tells Williams if he is unable to get up on his own, a team will have to enter the cell. Another officer suggests that Williams roll onto his side so he can pull himself up. Williams uses the cell door to pull himself to standing. None of the officers laugh, although one—who was not visible to Williams at the time—does appear to slightly smirk. No one makes inappropriate remarks; none treat Williams poorly. They are patient and consistent and professional.

Williams appears to recognize that, after watching the video, no jury could reasonably conclude that officers conducted the search in a humiliating, harassing, or demeaning manner. To get around this evidence, Williams asserts that the video was tampered with and digitally remastered to edit out a different strip search that occurred prior to the one on the video. Nothing in the video suggests that it has been tampered with, and Williams provides no evidence from which a jury could reach such a conclusion. The video is continuous from the time officers remove him from his cell until after the strip search is completed, and nothing suggests that it has been altered in any way. The Seventh Circuit has made clear that courts need not suspend reality when considering a non-moving party's assertions. *Gladney v. Pendleton Correctional Facility*, 302

12

Case 1:19-cv-01159-WCG   Filed 03/16/21   Page 12 of 17   Document 113

F.3d 773 774 (7th Cir. 2002). Williams' assertion is so fanciful and farfetched that the Court will not credit it.

Given that Williams presents no valid basis for discrediting the video and given that the video supports Defendants' version of what happened, the Court finds that Defendants are entitled to summary judgment on Williams' claims related to the strip search.

### D. Williams' Claims that Defendant Officers Violated the Eighth Amendment When They Disregarded His Serious Medical Needs Must Be Dismissed.

Williams asserts that Bockorny, Jones, Webster, Tierney, and Ellefson ignored his calls for help after he passed out, hit his head, lost control of his bowels, and experienced chest and stomach pains. These officers had minimal contact with Williams, and their responsibilities were limited; they were merely in the area of the holding cell or passed by quickly to do wellness checks. They assert that they did not see him pass out and saw no indication that he was in need of urgent medical care. To the contrary, Williams was combative and throwing feces into the hallway. Also, for much of the time, Williams was speaking to other staff members who were trying to address his needs.

As the Seventh Circuit has noted, "[p]ublic officials do not have a free-floating obligation to put things to rights . . . . Bureaucracies divide tasks; no prisoner is entitled to insist one employee do another's job." *Burks v. Raemisch*, 5535 F.3d 592, 595 (7th Cir. 2009). Defendants explain that they did not observe Williams experiencing symptoms requiring emergency care, other staff members were in consistent contact with Williams, and the on-call nurse had been contacted and summoned to the institution in the middle of the night to assess Williams. Given that Williams' concerns were being addressed, no jury could reasonably conclude that these Defendants were deliberately indifferent to his needs because they did not drop everything to respond to his demands. *See id.*

### E. Williams' Claims that Waterman and West Violated the Eighth Amendment Because They Were Deliberately Indifferent to His Serious Medical Needs Must Be Dismissed.

Williams asserts that Waterman and West were deliberately indifferent to his serious medical needs. He states that, after he was given the wrong medication, West did not assess his condition before she ended her shift and that Waterman did not take his condition seriously because she did not provide him with the medication he wanted or send him to the emergency room. The evidence does not support Williams' assertions.

First, West was not working when Williams mistakenly received another inmate's medication. Dkt. No. 91 at ¶¶112-115. Her shift ended at 7:00 p.m.; Williams took the medication some time between 7:15 and 7:45 p.m. She did not return to the institution until about 6:00 a.m. the following morning, long after the incident had been resolved. West was not on-call and was not aware that Williams had any need for medical care. Given that she was not personally involved, she cannot have been deliberately indifferent. She is entitled to summary judgment.

Next, at the time Waterman was notified of Williams' complaints and requests for care, she was at home because she was only on-call. She asked about Williams' complaints and inquired about his behavior. Based on security staff's description of how Williams was behaving, she did not believe he was in need of urgent care. She then drove to the institution so she could examine him in person. It is not entirely clear when she first spoke to him, but she terminated the meeting after he yelled profanities and threw his feces. Williams refused offers for medication because he did not believe it would work. Waterman waited for hours at the institution and, after Williams began to cooperate, she took his vitals and assessed his condition. She explains that he was not exhibiting signs indicating that he needed to go to the hospital or that he needed medication

stronger than over-the-counter medications. Williams disagreed, became angry, and hoped aloud that she would be hit by a truck on her way home. Dkt. No. 91 at ¶¶91-111.

Williams asserts that he was suffering chest and stomach pains and that he passed out and was regurgitating his food, which is sufficient for a jury to conclude that he was suffering from an objectively serious medical condition. However, Williams' claim against Waterman must be dismissed because no jury could reasonably conclude that she was deliberately indifferent to his condition. Waterman drove to the institution in the middle of the night and remained there for hours despite no signs that Williams was experiencing a medical emergency. She tried to examine him, and when his misconduct prevented her from completing her examination, she waited for hours until he calmed down. It is clear that Williams disagreed with her conclusions and that he wanted to dictate the treatments he would receive and the timetable on which he would receive them, but this is not a luxury that prisoners (or non-prisoners) enjoy. *See Drinkwater v. Larson*, 794 F. App'x 523, 527 (7th Cir. 2020) ("prison inmates are not entitled to demand specific care"). Further, it is well established that prisoner's disagreement with a medical professional's treatment decisions is insufficient to make out a constitutional claim. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976); *Pyles v. Fahim*, 771 F.3d 403, 409 (7th Cir. 2014). Given the efforts Waterman made to assess Williams' condition, no jury could reasonably conclude that she was deliberately indifferent to his medical needs. Waterman is entitled to summary judgment.

### F. Williams' Claims that the Institution Complaint Examiner Was Deliberately Indifferent to His Serious Medical Needs Must Be Dismissed.

Only a person who causes or participates in a violation can be liable. *George v. Smith*, 507 F.3d 605, 609 (7th Cir. 2007). "Ruling against a prisoner on an administrative complaint does not cause or contribute to the violation." *Id.* That said, the Seventh Circuit has acknowledged that, "[o]ne can imagine a complaint examiner doing her appointed tasks with deliberate indifference

15

to the risks imposed on prisoners." *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009). That, however, is not what occurred here. The evidence shows that Payne (the institution complaint examiner) reviewed Williams' inmate complaints, spoke to staff who provided her with relevant records, and then evaluated the inmate complaints. Based on her review, she recommended dismissal of the inmate complaints. Dkt. No. 91 at ¶¶116-132. Williams obviously disagrees with her decisions, but his disagreement is not sufficient to state a constitutional claim. The only reasonable conclusion is that Payne did her job. Because that is all the Constitution requires, she is entitled to summary judgment.

## CONCLUSION

**IT IS THEREFORE ORDERED** that Defendants' motion for summary judgment (Dkt. No. 89) is **GRANTED** and this case is **DISMISSED**. The Clerk is directed to enter judgment accordingly.

Dated at Green Bay, Wisconsin this 15th day of March, 2021.

                                               s/ William C. Griesbach
                                               William C. Griesbach
                                               United States District Judge

This order and the judgment to follow are final. Plaintiff may appeal this Court's decision to the Court of Appeals for the Seventh Circuit by filing in this Court a notice of appeal within **30 days** of the entry of judgment. *See* Fed. R. App. P. 3, 4. This Court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. *See* Fed. R. App. P. 4(a)(5)(A). If Plaintiff appeals, he will be liable for the $505.00 appellate filing fee regardless of the appeal's outcome. If Plaintiff seeks leave to proceed *in forma pauperis* on appeal, he must file a motion for leave to proceed *in forma pauperis* with this Court. *See* Fed. R. App. P. 24(a)(1). Plaintiff may be assessed another "strike" by the Court of Appeals if his appeal is found to be non-meritorious. *See* 28 U.S.C. §1915(g). If Plaintiff accumulates three strikes, he will not be able to file an action in federal court (except as a petition for habeas corpus relief) without prepaying the filing fee unless he demonstrates that he is in imminent danger of serous physical injury. *Id.*

Under certain circumstances, a party may ask this Court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within **28 days** of the entry of judgment. Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of judgment. The Court cannot extend these deadlines. *See* Fed. R. Civ. P. 6(b)(2).

A party is expected to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.